# EXHIBIT 1

| | |
|---|---|
| Weld County Combined Courts<br>901 9th Avenue<br>Greeley, CO 80632 | DATE FILED: February 3, 2016 3:44 PM<br>FILING ID: 72DDC867AF305<br>CASE NUMBER: 2016CV30111 |
| **Plaintiffs:**<br><br>SUZETTE WEST and JAMES WEST<br><br>v.<br><br>**Defendants:**<br><br>HENRY MENDEZ AND SAULSBURY<br>INDUSTRIES, INC., a Texas Corporation<br>registered to do business in Colorado. | <br><br><br><br><br><br>▲ COURT USE ONLY ▲ |
| Attorneys:<br>Sam Cannon<br>Attorney Registration #: 46132<br>Cannon Law, LLC<br>PO Box 620<br>Fort Collins, CO 80522<br>Telephone: (970) 930-1820<br>Fax: (970) 360-1004<br>e-mail: scc@cannonlaw.com<br>and<br>Ben Lebsack<br>Attorney Registration #: 45206<br>Arckey & Associates, LLC<br>6465 Greenwood Plaza Blvd., #250<br>Centennial, CO 80111<br>Telephone: (303) 798-8546<br>Fax: (303) 798-4637<br>e-mail: benl@arlaw.us | Case Number:<br><br>Division: |

**DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT**

1.  This cover sheet shall be filed with each pleading containing an initial claim for relief in every district court civil (CV) case, and shall be served on all parties along with the pleading. It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional

1

defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.  **Check one of the following:**

☐This case is governed by C.R.C.P. 16.1 because:

-   The case is not a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding; AND

-   A monetary judgment over $100,000 is not sought by any party against any other single party.  This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

☑This case is not governed by C.R.C.P. 16.1 because (check ALL boxes that apply):

☐The case is a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding.

☑ A monetary judgment over $100,000 is sought by any party against any other single party.  This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

☐Another party has previously indicated in a Case Cover Sheet that the simplified procedure under C.R.C.P. 16.1 does not apply to the case.

*NOTE: In any case to which C.R.C.P. 16.1 does not apply, the parties may elect to use the simplified procedure by separately filing a Stipulation to be governed by the rule within 49 days of the at-issue date.  See C.R.C.P. 16.1(e).  In any case to which C.R.C.P. 16.1 applies, the parties may opt out of the rule by separately filing a Notice to Elect Exclusion (JDF 602) within 35 days of the at-issue date.  See C.R.C.P. 16.1(d).*

☐A Stipulation or Notice with respect to C.R.C.P. 16.1 has been separately filed with the Court, indicating:

☐C.R.C.P. 16.1 applies to this case.

☐C.R.C.P. 16.1 does not apply to this case.

**3.** ☑ This party makes a **Jury Demand** at this time and pays the requisite fee.  See C.R.C.P. 38.  (Checking this box is optional.)


Date: February 3, 2016                          *s/ Sam Cannon*
                                                Sam Cannon, #46132

                                                *s/ J. Bennett Lebsack*
                                                J. Bennett Lebsack, #45206

| | |
|---|---|
| Weld County Combined Courts<br>901 9th Avenue<br>Greeley CO 80632 | DATE FILED: February 3, 2016 3:44 PM<br>FILING ID: 72DDC867AF305<br>CASE NUMBER: 2016CV30111 |
| **SUZETTE WEST** and<br>**JAMES WEST,**<br>Plaintiffs<br><br>v.<br><br>**HENRY MENDEZ** and<br>**SAULSBURY INDUSTRIES, INC.**, a Texas Corporation<br>registered to do business in Colorado,<br>Defendants. | ◆ COURT USE ONLY ◆ |
| Sam Cannon<br>Attorney Registration # 46132<br>Cannon Law, LLC<br>PO Box 620<br>Fort Collins, CO  80522<br>Telephone:  (970) 930-1820<br>Fax: (970) 360-1004.<br>e-mail:  scc@cannonlaw.com<br>and<br>Ben Lebsack<br>Attorney Registration # 45206<br>Arckey and Associates, LLC<br>6465 Greenwood Plaza Blvd #250,<br>Centennial, CO 80111<br>Telephone: (303) 798-8546<br>Fax: (303) 798-4637<br>e-mail: benl@arlaw.us | CASE:<br><br>DIVISION: |
| COMPLAINT AND JURY DEMAND | |

Plaintiffs Suzette West ("Ms. West") and James West ("Mr. West") (collectively "the Wests") were terminated after complaining about Ms. West being sexually harassed and subjected to unlawful sexual contact by her supervisor Defendant Henry Mendez ("Mendez") during their employment with Defendant Saulsbury Industries, Inc. ("Saulsbury"). For their Complaint, the Wests make the following allegations:

## JURISDICTION AND VENUE

1.    Plaintiffs bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* ("Title VII") and the Colorado Anti-Discrimination Act, C.R.S. § 24-34-301 *et seq.* ("CADA").

2.    The Court has jurisdiction over Defendant Saulsbury under C.R.S. § 13-1-124(1) because Defendant transacted business in this state and is alleged to have committed a tortious act in this state.

3.    The Court has jurisdiction over Defendant Mendez because he allegedly committed a tortious act in this state.

4.    The Court has jurisdiction over this case under Colo. Const. Art. 6 § 9, C.R.S. § 13-1-124(1)(b), C.R.S. § 24-34-306, C.R.S. § 24-34-405, and 42 U.S.C. § 2000e-5(f)(3).

5.    At all times relevant to this action, Saulsbury has located its business in Weld County and conducted business there. The services performed pursuant to Plaintiff's employment with Defendant were performed in Weld County and the alleged tortious conduct occurred in Weld County. Accordingly, venue is proper under Colo. Rev. Stat. § 8-1-111 and Colorado Rules of Civil Procedure 98(c).

## PARTIES

6.    The Wests are individuals living at 417 E. Eisenhower Blvd., Loveland, CO 80537.

7.    Saulsbury employed Suzette West from August 26, 2014 to March 6, 2015. Saulsbury employed James West from November 18, 2013 to January 22, 2015.

8.    Upon information and belief, Mendez is an individual who resides in Texas.

9.    Saulsbury is a Texas Corporation registered to do business in Colorado with its principal office address at 2951 E. I-20, Odessa, TX 79766.

10.   Saulsbury is engaged in an industry affecting commerce. It has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Saulsbury employs persons within Colorado. Saulsbury is subject to CADA and Title VII because it falls

within the definitions of an employer under C.R.S. § 24-34-401(3) and 42 U.S.C. 2000e(b), respectively.

## ADMINISTRATIVE PROCEDURES

11.     On April 20, 2015, Suzette West filed a Charge of Discrimination, Charge No. 541-2015-00397, with the EEOC, alleging discriminatory and unlawful employment practices. Under the work sharing agreement between the CCRD and EEOC, the Charge was also filed with the CCRD.

12.     On April 20, 2015, James West filed a Charge of Discrimination, Charge No. 541-2015-00830, with the EEOC, alleging discriminatory and unlawful employment practices. Under the work sharing agreement between the CCRD and EEOC, the Charge was also filed with the CCRD.

13.     On November 12, 2015, the EEOC issued to Ms. West and Mr. West their Notices of Right to Sue.

14.    Ms. West and Mr. West have exhausted their administrative remedies under C.R.S. § 24-34-306 and 42 U.S.C. § 2000e-5.

15.     Ms. West and Mr. West filed their claims in this civil action within 90 days of receiving their Notices of Right to Sue.

## SPECIFIC ALLEGATIONS

THE WESTS' HIRING AND EMPLOYMENT BEFORE THE SEXUAL HARASSMENT

16.     Saulsbury provides engineering, construction, fabrication and services to heavy industrial clients across a wide range of industries. In early 2014, Saulsbury began providing construction services in Lucerne, Colorado for the development of a natural gas refinery.

17.     Saulsbury hired Suzette West to work as a spotter on a project in Lucerne, Colorado on August 26, 2014.

18.     Mendez was the onsite Human Resources supervisor for Saulsbury.

19.     During Ms. West's orientation, Mendez directed Ms. West to work in the Human Resources office with him instead of working as a spotter. Mendez

told Ms. West that he informed Richard Womack, Project Manager, about the reassignment.

20.    During her employment until Mendez's resignation in November 2013, Mendez was one of Ms. West West's supervisors. Mendez had authority to terminate Ms. West's employment. Mendez had authority to discipline Ms. West for performance problems, employment misconduct, and other behavior.

21.    Saulsbury hired James West, Ms. West's husband, on November 18, 2013.

22.    Mr. West transferred to the Lucerne job site on June 16, 2014.

23.    Mr. West was initially hired as an apprentice II, but was promoted to apprentice III. During the relevant time period, he was working as a spotter for a heavy machinery operator.

24.    At some point, Suzette West's two sons, Garrett Seaman and Michael Seaman, were hired by Saulsbury to work on the Lucerne job.

ORGANIZATION OF THE LUCERNE JOB SITE

25.    Womack was the site supervisor for the Lucerne job. Throughout their employment, Richard Womack was one of the Wests' supervisors. Womack had authority to terminate their employment. Womack had authority to discipline them for performance problems, employment misconduct, and other behavior.

26.    Mendez was Suzette West's supervisor until his termination. At that time, Delinda Sims became Ms. West's supervisor.

27.    Throughout James West's employment, Gary Young was one of Mr. West's supervisors. Young had authority to terminate his employment. Young had authority to discipline him for performance problems, employment misconduct, and other behavior.

28.    Gary Young was Mendez's roommate and Womack's brother.

MENDEZ'S UNLAWFUL SEXUAL HARASSMENT AND SEXUAL CONTACT

29.    Shortly after Suzette West started working with Mendez, he claimed that he was a former FBI agent and showed her photos of an FBI office. He told her

that he had mafia connections and implied that they were willing to commit criminal acts on his behalf. He told her his friends had "cleaned up" other people's escapades. Regarding another employee, Mendez said, "I will f--k him up, and he will never even see it coming."

30.    Mendez also stated that he was well connected within Saulsbury, had influence in the company about who received what jobs, and that "Odessa liked him." Saulsbury's corporate offices are in Odessa.

31.    Mendez bragged about his wealth and gambling winnings. A few times, he directed Ms. West to buy lunch for the office. When he handed her money to buy lunch, he told her, "don't worry about it, I'm not going to even count it when you bring it back," implying that Ms. West could hold onto extra money if she wanted. Ms. West always returned the correct change.

32.    Mendez texted Ms. West sexual comments during work and when she went to buy lunch for the office.

33.    Ms. West never provided her personal email to Mendez. Nevertheless, on September 21, 2014, Mendez sent Ms. West a sexually explicit twelve-paragraph email titled "My dream" To Ms. West's personal email.

34.    In "My dream," Mendez described a dream in which Ms. West stayed late after work and had a sexual encounter with Mendez. Per the email, "As usual you were looked [sic] so hot in your tight little jeans that shows off your perfectly shaped butt." Mendez explained that he "always looked forward to your arrival at work because I couldn't wait to see what sexy little outfit you might be wearing that day." The email details the sexual acts that Mendez wants to perform with Ms. West, including "You are delirious with lust as your trembling hand rubs on my engorged throbbing c--k" and "We are f--king our brains out as you slam and grind you[r] a-- on to my hard b---s."

35.    Soon after receiving the "My dream "email, Mendez asked Ms. West if she received his email. Embarrassed and afraid that she would encourage Mendez, she said she had not.

36.    On September 22, 2014, Mendez sent Ms. West another email titled "You are so fine !!!!."

37.    The "You are so fine !!!!" email describes another sexual encounter with Ms. West.

38.    Mendez asked Ms. West again whether she was receiving his emails. Ms.
       West said she had not read his emails.

39.    During October, Mendez started making comments about how sexy Ms.
       West looked in her jeans. He told her he wanted her. Ms. West asked him
       to stop.

40.    On about October 27, 2014, in the Human Resources trailer, Mendez
       approached Ms. West from behind and used both of his hands to grabbing
       Ms. West's buttocks stating, "Mmmm." Ms. West told him to stop and
       pushed his hands away. Mendez moved one hand to Ms. West's breast,
       saying, "I can't help it." Ms. West pushed his hand away, exclaiming, "Henry,
       please stop!" Mendez backed up, smiled, and said, "I'm sorry, I'm a bad boy,
       guess you need to punish me." Ms. West walked away from Mendez.

41.    On October 29, 2014, Mendez grabbed Ms. West as she walked by him in
       the office. He grabbed her waist, pulled her towards him, and buried his
       head in Ms. West's breasts. He told her he needed a hug. Ms. West
       rebuffed Mendez's advances, pushing him away and telling him to stop.

42.    On about October 31, 2014, Mendez rubbed Ms. West's thigh and tried to
       touch her private area. When Ms. West told him to stop, Mendez said, "I'm
       sorry, I'll stop, you just look so good."

43.    Ms. West believed in good faith that she was the victim of illegal sexual
       harassment.

44.    Ms. West was in fact the victim of sexual harassment.

45.    Mendez's conduct constituted unlawful sexual conduct under C.R.S. § 18-3-
       404 in that he touched her breast, buttocks, and private area without her
       consent for the purpose of sexual gratification.

THE WEST'S OPPOSITION TO THE SEXUAL HARASSMENT

46.    On October 27, 2014, Ms. West mentioned that she had been subject to
       unlawful sexual contact by Mendez to Robert Campos.

47.    Upon information and belief, after being informed of the unlawful sexual
       contact, Robert Campos told Womack about it.

6

48.    Despite her complaint, Mendez continued to harass Ms. West.

49.    On approximately October 28, 2014, Ms. West left a voicemail with Saulsbury's Human Resources department in Baton Rouge because she was scared that Mendez had friends at Saulsbury's main corporate office in Odessa.

50.    Despite her complaint to Baton Rouge, Mendez continued to harass Ms. West. On approximately October 28, 2014, Ms. West told Mr. West about Mendez's sexual harassment.

51.    On approximately November 1, 2014, Womack spoke to Mr. West about the situation between Mendez and Ms. West. Womack said that Mendez was a liar and manipulator. Womack also said that they needed to get Ms. West away from Mendez.

52.    Mr. West told Womack, "You need to do something."

53.    Ms. West also contacted the EEOC in late October to inquire about how to file a Charge of Discrimination because of the harassment.

54.    Ms. West also complained to Richard Womack, Janet Womack, document control clerk, and Holly Weir, payroll clerk, about the harassment.

55.    A week after Ms. West's complaint to Human Resources, On November 3, 2014, Saulsbury sent Edward Harrington from its Human Resources office in Odessa to the Lucerne job site to interview Ms. West and Mr. West.

56.    Ms. West and Mr. West were each present during the joint interview.

57.    During the interview, Ms. West told Saulsbury's Human Resources representatives about Mendez's behavior and that she considered it illegal sexual harassment but that she would not continue with a complaint to the EEOC so long as the company took appropriate action against Mendez and that Ms. West and her family did not suffer any retaliation at work. Mr. Harrington told her the company would not retaliate against her.

58.    After Saulsbury's interview with the Wests, Mendez resigned.

59.    Ms. West filed criminal charges against Mendez.

## SAULSBURY'S RETALIATION AGAINST THE WESTS

### Mr. West's Termination

60. Approximately two weeks before Mr. Harrington's interview with the Wests, Gary Young, Mendez's roommate and James West's supervisor, told Mr. West that he would be receiving a raise.

61. After Mendez was terminated, Young told Mr. West that he would not receive a raise.

62. At some time after the Wests had participated in the interview about Mendez's harassment of Ms. West, Jeffrey Tarbox, a site foreman, told Benny Guzman, one of Mr. West' supervisors to "keep an eye on" Mr. West. Despite Guzman asking for clarification, Tarbox would not say why.

63. On about January 9, 2015, Guy Robinson, one of Mr. West's supervisors with authority to terminate Mr. West's employment, entered the Human Resources trailer wearing his motorcycle gang clothing. He told Suzette West that his gang had issues with another gang and that one of his "brothers" stabbed another biker recently.

64. A few days later, Jeff Tarbox, Site Foreman, told Mr. West that Delinda Sims told Guy Robinson that Mr. West could not take his breaks and lunch with Ms. West in the Human Resources trailer as he had been. Mr. West ran into Ms. Sims later that day and asked her about the direction. Ms. Sims denied telling anyone that he was unwelcome in the office.

65. On about January 14, 2015, Mr. West asked Womack if he was allowed to take his breaks and lunch with Ms. West in the Human Resources trailer. Womack responded that he personally did not have a problem with Mr. West going to see Ms. West in the Human Resources trailer but that there was a Saulsbury policy against workers of Mr. West's rank (grey hats) going through the gate between the job site and the Human Resources trailer during work hours.

66. There was no policy against grey hats going through the gate between the job site and the Human Resources trailer during work hours.

67. In fact, grey hats periodically had to go through the gate to retrieve tools during work hours.

68.     Other grey hats would go through the gate between the job site and the Human Resources trailer during work hours without being disciplined.

69.     That same day, detective Robert Roberts with the Weld County Sheriff's Office visited the Lucerne project to interview Ms. West and Mr. West about Henry Mendez.

70.     Later in the day, Benny Guzman asked Mr. West to get a razor knife from his car. Mr. West told two coworkers in addition to Guzman where he was going and why. Mr. West went to the bathroom, grabbed the knife from his car, and began walking back to Mr. Guzman. Mike Seaverson, Guy Robinson's son-in-law, drove by in a company truck. Mr. Seaverson let Mr. West into the truck and drove him back to Mr. Guzman. During the ride, Mr. Seaverson told Mr. West that he saw someone (Detective Roberts) asking Mr. West questions earlier and wanted to know who the person was. Mr. West told Mr. Seaverson that the matter was private. Mr. Seaverson replied that a "higher up" wanted to know who was asking questions and what the questions were about.

71.     Although Mr. West had told Guzman and two other workers where he was going and why, Guy Robinson issued Mr. West a "written reminder" for leaving the job site without notifying his supervisor in relation to the incident.

72.     An oral reminder is step one of Saulsbury's progressive discipline process.

73.     A written reminder is step two of Saulsbury's progressive discipline process.

74.     A critical reminder is step three of Saulsbury's progressive discipline process.

75.     Termination is step four of Saulsbury's progressive discipline process.

76.     During the discussion about the Reminder, Mr. West explained that he went to the bathroom, got the knife from his car, and did not cause work to stop because he informed his coworkers who worked without him. Mr. West asked if Mr. Robinson had questioned the coworkers. Mr. Robinson said he did and they confirmed Mr. West's version of events. Mr. West asked if he was being disciplined for refusing to tell Mr. Seaverson about the detective. Mr. Robinson answered affirmatively, explaining it was his business to know who the person was. Mr. West responded that it was not Mr. Robinson's business and human resource matters are confidential. Mr. Robinson pushed further, and Mr. West explained who the detective was. Mr. Robinson told

Mr. West that he should not be meeting with the detective at work and the detective should not be at the jobsite. Mr. West explained that he did not make an appointment or tell the detective to meet him at work. Mr. Robinson told Mr. West he could not go the

77.    Human Resources trailer during his breaks anymore and that he would check if Saulsbury policies prohibited Mr. West from taking lunch there as well.

78.    On January 17, 2015, Mr. West complained about the written reminder to Ms. Sims, who replaced Mendez as onsite Human Resources supervisor. During the conversation with Ms. Sims, Richard Womack and Guy Robinson, were present. Ms. Sims explained that Mr. West should not have received a written warning because Mr. West had not received a verbal warning yet, a requirement under the progressive discipline policy. Womack said that if that was the case, then she should change the warning to a verbal one.

79.    On January 22, 2015, Mr. West went to the Human Resources trailer to ask Ms. Sims if she had changed the warning to a verbal one. She said she had not, but pulled the written warning from her files and changed the form in front of Mr. West.

80.    Later that day, Richard Womack informed Mr. West of his termination from employment at Saulsbury for visiting the Human Resources trailer earlier in the day. Womack and a few other supervisors escorted Mr. West off the property.

81.    Mr. West never received a written reminder about his work conduct.

82.    Mr. West never received a critical reminder about his work conduct.

MS. WEST'S SONS' TERMINATIONS

83.    Soon after Mr. West' termination, Womak and another Saulsbury employee, Pepe Hinojosa, told the supervisor of Ms. West's son, Michael Seaman, to keep an eye on Michael Seaman.

84.    During the same period Tony Day, the supervisor of Ms. West's other son, Garrett Seaman, told Garrett Seaman that Womack wanted Day to write Garrett Seaman up.

85.    Saulsbury terminated Michael and Garrett Seaman's employment in early 2015.

### Ms. West's Termination

86.    On March 6, 2015, Ms. West's employment at Saulsbury was terminated. Purportedly, Saulsbury terminated Ms. West's employment because it had hired enough employees for the Lucerne project and Womack decided that the project could save administrative costs by disbanding the onsite Human Resources department.

87.    Other employees who were laid off at the same time as Ms. West's were offered new positions with Saulsbury.

88.    Ms. West was never offered another position with Saulsbury.

89.    Despite hiring Ms. West as a spotter, and not a Human Resources employee, Saulsbury did not offer a spotter position when her Human Resources job was terminated.

90.    After her termination, Ms. West left a voicemail for and sent an email to Mr. Harrington, who promised her that Saulsbury would not retaliate against her. Mr. Harrington did not respond to Ms. West.

## FIRST CLAIM FOR RELIEF
(Sexual Assault and Battery by Suzette West against Henry Mendez)

91.    Plaintiff incorporates all above allegations into this claim for relief.

92.    Mendez's actions resulted in physical contact with Suzette West because Mendez touched Ms. West's intimate areas without her consent.

93.    Mendez intended to make harmful or offensive physical contact with Ms. West's intimate areas without her consent.

94.    The contact with Ms. West's intimate area was harmful or offensive.

95.    Mendez knowingly touched the clothing covering the immediate area of Ms. West's intimate parts for the purposes of sexual arousal, gratification, or abuse.

96.    Because of the contact, Ms. West suffered damages.

## SECOND CLAIM FOR RELIEF
(Hostile Work Environment Based on Sex by Suzette West
against Saulsbury under Title VII)

97. Ms. West incorporates all allegations in this pleading.

98. Ms. West was subject to conduct that created a hostile work environment based on her sex.

99. The conduct was unwelcome.

100. The conduct was offensive.

101. The conduct was sexual in nature and directed at Ms. West because of her sex.

102. The conduct complained of was sufficiently severe or pervasive to alter the terms and conditions of Ms. West's employment by creating an abusive working environment.

103. Saulsbury knew or should have known about the conduct to which Ms. West was subjected and failed to implement reasonably prompt and appropriate corrective action.

104. Because Ms. West was subject to conduct that created a hostile work environment based on her sex, Ms. West suffered damages, including lost wages, loss of other employment benefits, and emotional distress.

## THIRD CLAIM FOR RELIEF
(Retaliation by Suzette West against Saulsbury under CADA)

105. Plaintiff incorporates all above allegations into this claim for relief.

106. Ms. West opposed unlawful sexual harassment by reporting the harassment to her Human Resources department and participated in an investigation related to her allegation of sexual harassment against Henry Mendez.

107. Saulsbury took action against Ms. West that a reasonable employee would have found materially adverse in that it terminated her husband then laid off Ms. West and her two sons.

12

108.  Saulsbury would not have terminated Ms. West's husband or laid off her and her two sons but for Ms. West's report of sexual harassment to Human Resources and participation in the interview related to the sexual harassment.

109.  Because of Saulsbury's retaliation against Ms. West, she has suffered harms and losses and is entitled to compensation including reinstatement, back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

### FOURTH CLAIM FOR RELIEF
(Retaliation by Suzette against Saulsbury under Title VII)

110.  Plaintiff incorporates all above allegations into this claim for relief.

111.  Ms. West opposed unlawful sexual harassment by reporting the harassment to her Human Resources department and participated in an investigation related to her allegation of sexual harassment against Henry Mendez.

112.  Saulsbury took action against Ms. West that a reasonable employee would have found materially adverse in that it terminated her husband then laid off Ms. West and her two sons.

113.  Saulsbury would not have terminated Ms. West's husband or laid off her and her two sons but for Ms. West's report of sexual harassment to Human Resources and participation in the interview related to the sexual harassment.

114.  Because of Saulsbury's retaliation against Ms. West, she has suffered harms and losses and is entitled to compensation including reinstatement, back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

### FIFTH CLAIM FOR RELIEF
(Retaliation by James West against Saulsbury under CADA)

115.  Plaintiff incorporates all above allegations into this claim for relief.

116.  Mr. West opposed unlawful sexual harassment by discussing Ms. West's allegations of sexual harassment against Henry Mendez with Richard Womack and by participating in an interview related to Ms. West's allegations.

117. Saulsbury took action against Mr. West that a reasonable employee would
have found materially adverse in that it terminated him then laid off his wife
and her two sons.

118. Saulsbury would not have terminated Mr. West nor laid off Ms. West and
her two sons but for Mr. West's discussion of Ms. West's allegations of
sexual harassment and participation in the interview related to the
allegations.

119. Because of Saulsbury's retaliation against Mr. West, he has suffered harms
and losses and is entitled to compensation including reinstatement, back
pay, front pay, compensatory damages, punitive damages, and attorney's
fees and costs.

## SIXTH CLAIM FOR RELIEF
(Retaliation by James West against Saulsbury under Title VII)

120. Plaintiff incorporates all above allegations into this claim for relief.

121. Mr. West opposed unlawful sexual harassment by discussing Ms. West's
allegations of sexual harassment against Henry Mendez with Richard
Womack and by participating in an interview related to Ms. West's
allegations.

122. Saulsbury took action against Mr. West that a reasonable employee would
have found materially adverse in that it terminated him then laid off his wife
and her two sons.

123. Saulsbury would not have terminated Mr. West nor laid off Ms. West and
her two sons but for Mr. West's discussion of Ms. West's allegations of
sexual harassment and participation in the interview related to the
allegations.

124. Because of Saulsbury's retaliation against Mr. West, he has suffered harms
and losses and is entitled to compensation including reinstatement, back
pay, front pay, compensatory damages, punitive damages, and attorney's
fees and costs.

## SEVENTH CLAIM FOR RELIEF
(Extreme and Outrageous Conduct by Suzette West against Henry Mendez)

125. Plaintiff incorporates all above allegations into this claim for relief.

126. Mendez engaged in extreme and outrageous conduct when he touched Ms. West in her private areas without Ms. West's consent.

127. Mendez did so recklessly or with the intent of causing Ms. West severe emotional distress.

128. Ms. West suffered severe emotional distress because of Mendez's extreme and outrageous conduct.

129. Because of Mendez's extreme and outrageous conduct, Ms. West suffered harms and losses including: pain and suffering, physical and mental distress, loss of enjoyment of life, and permanent impairment.

## EIGHTH CLAIM FOR RELIEF
(Wrongful Termination in Violation of Public Policy
by Suzette West against Saulsbury)

130. Plaintiff incorporates all above allegations into this claim for relief.

131. C.R.S. § 18-8-115 provides that "[i]t is the duty of every corporation or person who has reasonable grounds to believe that a crime has been committed to report promptly the suspected crime to law enforcement authorities."

132. C.R.S. § 24-4.1-301 provides that "the full and voluntary cooperation of victims of and witnesses to crimes with state and local law enforcement agencies as to such crimes is imperative for the general effectiveness and well-being of the criminal justice system of this state."

133. C.R.S. § 24-4.1-302.5(1) & (1)(a) provides that "[i]n order to preserve and protect a victim's rights to justice and due process, each victim of a crime shall have the following rights . . . . [t]he right to be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process . . . ."

134. C.R.S. 24-4.1-303(8) provides that "[a]n employer may not discharge or discipline any victim or a member of a victim's immediate family for honoring a subpoena to testify in a criminal proceeding or for participating in the preparation of a criminal proceeding."

135.  On October 7, 2009, Governor Bill Ritter, Jr. issued an Executive Order
stating in relevant part that "[w]orkplace violence, including domestic
violence that affect the workplace, is a serious public health, safety, and
policy concern of the State of Colorado."

136.  On August 13, 1996, Governor Roy Romer issued an Executive Order
stating in relevant part that "WHEREAS, the incidence and prevalence of
workplace violence have increased in recent years; and WHEREAS, State
employees have the right to expect their employer to take necessary steps
to provide a violence-free environment and an opportunity to address issues
concerning violence; and WHEREAS, the State of Colorado has several
policies reflecting its –commitment to maintaining a safe and healthy
working environment for its employees, clients and the public; and
WHEREAS, this policy on workplace violence is consistent with that
commitment."

137.  During her employment, Ms. West exercised a statutory, regulatory, or rule-
based right relating to public health, safety, and welfare and performed a
public duty relating to her basic responsibility as a citizen by filing a police
complaint against Mendez, cooperating in a police investigation, and
participating in the preparation of a criminal proceeding because she
reasonably believed she had a right to follow the statutes cited above.

138.  Saulsbury was aware or reasonably should have been aware that Ms. West
reasonably believed she had the right to file a police complaint against
Mendez, cooperate in a police investigation, and participate in the
preparation of a criminal proceeding.

139.  Saulsbury terminated Ms. West's employment because she exercised a
statutory, regulatory, or rule-based right relating to public health, safety, and
welfare and performed a public duty relating to her basic responsibility as a
citizen.

140.  Saulsbury's conduct was willful and wanton and attended by circumstances
of malice and reckless disregard for the rights of Ms. West.

141.  Because of Saulsbury's conduct, Ms. West suffered damages, including lost
wages, loss of employment benefits, and emotional distress.

NINTH CLAIM FOR RELIEF
(Wrongful Termination in Violation of Public Policy
by James West against Saulsbury)

142.    Plaintiff incorporates all above allegations into this claim for relief.

143.    During her employment, Mr. West exercised a statutory, regulatory, or rule-based right relating to public health, safety, and welfare and performed a public duty relating to his basic responsibility as a citizen by assisting Ms. West in filing a police complaint against Mendez, cooperating in a police investigation, and participating in the preparation of a criminal proceeding because he reasonably believed he had a right to follow the statutes cited above.

144.    Saulsbury was aware or reasonably should have been aware that Mr. West reasonably believed he had the right to assist Ms. West in filing a police complaint against Mendez, cooperate in a police investigation, and participate in the preparation of a criminal proceeding.

145.    Saulsbury terminated Mr. West's employment because he exercised a statutory, regulatory, or rule-based right relating to public health, safety, and welfare and performed a public duty relating to her basic responsibility as a citizen.

146.    Saulsbury's conduct was willful and wanton and attended by circumstances of malice and reckless disregard for the rights of Mr. West.

147.    Because of Saulsbury's conduct, Mr. West suffered damages, including lost wages, loss of employment benefits, and emotional distress.

## REQUESTED RELIEF

148.    The Wests respectfully ask the Court to enter judgment in their favor and against Defendants in an amount to be determined at trial, and award them all relief allowed by law, including but not limited to:
   a.   Economic Losses, including back pay,
   b.   Front pay,
   c.   Compensatory damages,
   d.   Attorneys' fees,
   e.   The costs of bringing this action,
   f.   Pre-judgment and post-judgment interest, and
   g.   Any other relief justice requires and law or equity allow.

## JURY DEMAND

The West's demand a jury trial on all issues for which they are entitled to one.

Respectfully submitted February 5, 2016 by,
CANNON LAW, LLC
*s/ Sam Cannon*
Sam Cannon #46132

and

ARCKEY AND ASSOCIATES, LLC

*s/ J. Bennett Lebsack*
J. Bennett Lebsack #45206

*/s Thomas J. Arckey*
Thomas J. Arckey #14551

18